# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

MEGAN AROON DUNCANSON and
SHERI MARIE WISEMAN,

                **Plaintiffs,**

v.                                               **Case No:   6:14-cv-704-Orl-40KRS**

WINE & CANVAS DEVELOPMENT,
LLC, SARAH MARIE WATHEN,
JOSHUA MICHAEL WATHEN, SJ
WATHEN BLOOMINGTON LLC,
YABOO LLC, WINE AND CANVAS IP
HOLDINGS LLC, TAMARA SCOTT,
ANTHONY SCOTT, WNC OF
JACKSONVILLE, LLC and WNC OF
ORLANDO, LLC,

                **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

       This cause came on for consideration after an evidentiary hearing on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' AMENDED MOTION TO DISMISS AMENDED COMPLAINT AND FOR RELATED AND ALTERNATIVE RELIEF (Doc. No. 70)** |
| **FILED:** | **September 16, 2014** |

## I.    INTRODUCTION.

       On May 5, 2014, Plaintiffs Megan Aroon Duncanson ("Duncanson") and Sheri Marie Wiseman ("Wiseman") filed a complaint raising claims of direct, contributory, and vicarious infringement against Wine & Canvas Development, LLC ("W&C Development"); Joshua Michael Wathen and Sarah Marie Wathen, jointly; SJ Wathen Bloomington, LLC ("SJ Wathen

Bloomington"); Yaboo LLC; and Melissa Loerwald ("Loerwald").   Doc. No. 1.   Plaintiffs subsequently filed an amended complaint, adding Wine and Canvas IP Holdings, LLC ("W&C IP Holdings"), Anthony Scott ("Scott"), Tamara McCracken ("McCracken"),[1] WNC of Orlando LLC, and WNC of Jacksonville, LLC as new defendants.   Doc. No. 36.   The amended pleading also removed Loerwald as a party and named Sarah Marie Wathen and Joshua Michael Wathen individually.

On September 16, 2014, W&C IP Holdings, W&C Development, Scott, McCracken, Joshua Michael Wathen, Sarah Marie Wathen, and Yaboo, LLC filed an amended motion to dismiss the amended complaint (the "Motion").   Doc. No. 70.   Defendants claim, *inter alia*, that the Court lacks personal jurisdiction over W&C IP Holdings, W&C Development, SJ Wathen Bloomington, Scott, and McCracken.[2]   *Id.* at 15–17.   Plaintiffs filed their response in opposition to the Motion, Doc. No. 75, and Defendants filed a reply brief, Doc. No. 81.   The Defendants' reply brief also requested that the Court strike certain statements made in and documents attached to Plaintiffs' response.   *Id.*   The Court denied that request without prejudice.   Doc. No. 90.

On April 6, 2015, I held an evidentiary hearing on the issue of personal jurisdiction.   I also afforded the parties leave to file post-hearing briefs, and such briefs were timely filed.   *See* Doc. Nos. 116–17.   Defendants' Motion is now ripe for review.

From the time this case was filed, it has suffered from profound ambiguities.   A sizeable majority of the allegations of Plaintiffs in the amended complaint are not well-pled, instead attributing the acts alleged to have occurred to all "Defendants" or "Defendant(s)," even though practical realities made abundantly clear that such could not be the case.   *See, e.g.*, Doc. No. 36

---

[1] McCracken is identified in the styling of the case as "Tamara Scott."   However, during her deposition and in other documents, she is identified as "Tamara McCracken."   Accordingly, I refer to her as McCracken throughout this Report and Recommendation.

[2] Joshua Wathen, Sarah Wathen, and Yaboo, LLC did not contest the Court's exercise of personal jurisdiction over them.

¶¶ 27–28, 32, 40.   Moreover, the testimony and exhibits presented at the jurisdictional hearing often lacked clear attribution to the specific parties at issue in this case.   At that hearing, counsel for Plaintiffs appeared unaware that the amended complaint asserts more than one count.   Doc. No. 114, at 5:1–5.   When asked on separate occasions for the bases upon which Plaintiffs contended the Court could exercise personal jurisdiction, counsel for Plaintiffs offered shifting responses. *Compare* Doc. No. 114, at 7:25–13:4, *with id.* at 12:11–13:4, *and id.* at 240:10–247:13.   These bases shifted yet again in Plaintiffs' post-hearing brief.   *See* Doc. No. 116.

Yet the Court must take the pleadings, briefs, arguments, and evidentiary submissions as the parties have presented them.   Because different standards and evidentiary considerations govern the arguments raised in Defendants' Motion, I will address those arguments in two separate Report and Recommendations.   In this Report and Recommendation, I will first assess whether the Court may exercise personal jurisdiction over Defendants who move to dismiss on that basis.   In a subsequent Report and Recommendation, I will address the remaining arguments raised in the Motion, as well as the other pleading deficiencies glaringly apparent from Plaintiffs' amended complaint.   *See R&R Games, Inc. v. Fundex Games, Ltd.*, No. 8:12-cv-01957-T-27TBM, 2013 U.S. Dist. LEXIS 28426, at *3–32 (M.D. Fla. Feb. 28, 2013) (assessing personal jurisdiction before pleading deficiencies).

## II.   FACTUAL BACKGROUND.

### A.   *The "Wine and Canvas" Business Model.*

Scott and McCracken developed the idea for the "Wine and Canvas" brand in December 2009 or January 2010.   McCracken Depo. at 26:15–18.[3]   W&C Development was then organized as a limited liability company under the laws of the State of Indiana on February 12, 2010.[4]   Pls.'

---

[3] The parties presented exhibits and deposition designations during the evidentiary hearing on the Motion.   Those documents are in the custody of the Clerk of Court.

[4] W&C Development was originally organized under the name "Ava Ventures LLC."   *See* Doc. No. 114, at 22:5–13; Pls.' Hearing Ex. 18, at 1–3.   On April 7, 2011, McCracken's father, as the sole

Hearing Ex. 18.   The company is a business operating in Indianapolis, Indiana.   Pls.' Hearing Ex. 30 ¶ 5.   It runs painting classes that offer artistic instruction and entertainment, combined with alcoholic beverages, in a variety of venues.   Pls.' Hearing Ex. 30 ¶ 5.   W&C Development owns the "Wine and Canvas" trademark, *see* Doc. No. 114, at 49:5–10, and it was the first entity to operate a location bearing the "Wine and Canvas" name, *id.* at 29:8–15.   Although McCracken was originally the sole member of W&C Development, *see id.* at 22:5–13; Pls.' Hearing Ex. 18, at 1–3, her father replaced her in November 2010 and has remained the sole member since that time, Doc. No. 114, at 21:25–22:13; Pls.' Hearing Ex. 18, at 6.

Originally, W&C Development was intended to be the licensing business for the "Wine and Canvas" trademark.   McCracken Depo. at 142:16–20.   Accordingly, when SJ Wathen Bloomington sought to operate in Bloomington, Indiana as the first new licensee, it licensed the "Wine and Canvas" mark from W&C Development.   Doc. No. 114, at 29:16–31:6; Pls.' Hearing Ex. 32, at 3.   W&C Development also invested time and money in advertising the "Wine and Canvas" trademark and in creating franchising opportunities.   Pls.' Hearing Ex. 38 ¶ 10. Ultimately, however, W&C Development did not create any franchises.   Pls.' Hearing Ex. 25, at 4.

W&C IP Holdings was formed on January 1, 2012, as an Indiana company to license the "Wine and Canvas" mark and concept behind the painting classes throughout the country.   *See* Doc. No. 114, at 14:25–15:14, 18:14–18; Doc. No. 36 ¶ 6.   The company operates out of Scott's home in Indiana.   Doc. No. 114, at 55:10–13.   As owner of the "Wine and Canvas" mark, W&C Development granted exclusive rights to the mark to W&C IP Holdings.   Doc. No. 114, at 113:9– 21.   Shortly after licensing the mark from W&C Development, SJ Wathen Bloomington switched to a formal licensing agreement with W&C IP Holdings.   Pls.' Hearing Ex. 32, at 3; Doc. No. 114,

---

member, filed a certificate of amendment with the Secretary of State of Indiana, changing the name to "Wine and Canvas Development LLC."   Pls' Hearing Ex. 18, at 6–10.

at 102:14–18.   W&C Development is not presently involved in any licensing agreements other than the one into which it entered with W&C IP Holdings.   Doc. No. 114, at 39:3–10.

W&C IP Holdings's licensees host events consisting of artistic instruction by independent contractors on how to paint selected paintings.   McCracken Depo. at 137:19–23.   Between forty-eight and fifty licensees existed as of April 6, 2015.   Doc. No. 114, at 29:4–7.   These licensees include entities operating in Jacksonville, Orlando, Fort Myers, Fort Lauderdale, and Tampa, Florida.   *Id.* at 15:20–22.   Each licensee pays a monthly 8% royalty fee to W&C IP Holdings, which is based on gross sales.   *Id.* at 16:17–17:12; McCracken Depo. at 158:14–18.   The licensees also submit a report to W&C IP Holdings concerning their gross sales, so that their royalty payment may be calculated.   Doc. No. 114, at 17:6–13; McCracken Depo. at 165:21–24.

At the hearing, Plaintiff submitted into evidence the licensing agreement entered into between W&C IP Holdings and WNC of Tampa LLC.   Defs.' Hearing Ex. 7.   The agreement is substantially the same as the ones signed by all licensees.   Doc. No. 114, at 131:1–4.   It provides licensees a revocable, non-exclusive, and non-transferable right to use trademarks, artistic renderings, paintings, signage, and marketing, advertising, and promotional materials owned by W&C IP Holdings or its affiliates.   Defs.' Hearing Ex. 7 ¶¶ 1.4–.5, 2.1, 2.4.   The licensees are also given a license to "use, reproduce, distribute copies of, make derivative works of, publish, distribute, display, broadcast and/or transmit" the licensed copyrighted works within specified geographic territories.   *Id.* ¶ 2.4.   The licensees may modify or create derivative works of the licensed copyrighted materials and use such modified or derived works "subject to the prior written approval of [W&C IP Holdings]."   *Id.*   If W&C IP Holdings does not provide such approval, the licensee is "prohibited from employing same under the terms of th[e] Agreement."   *Id.* ¶ 2.4.   The licensing agreements further provide that W&C IP Holdings will obtain ownership rights to certain categories of artwork and trademarks created by licensees under the agreement.   Defs.' Hearing Ex. 7 ¶¶ 2.4–.5, 3.1, 3.3, 3.4.

Each licensee also enters into an agreement with one of the following entities, for which McCracken's father is the sole managing member: WC Holdings 1, LLC; WC Holdings 2, LLC; WC Holdings 3, LLC; WC Holdings 4, LLC; or WC Holdings 5, LLC.   Doc. No. 114, at 34:21–35:20; *id.* at 140:4–6.   These agreements were entered into for the first year of each licensee's existence, *id.* at 35:25–36:12, and were set up to exert a measure of control over the licensees selling the businesses and to put a noncompete provision in place, *id.* at 38:6–14.   The arrangement provided the relevant WC Holdings entity an ownership interest in the licensee for the first year, after which time that portion of the ownership reverted to the licensee retroactively.   *Id.* at 38:14–18.

W&C IP Holdings owns the website wineancanvas.com, which was created in 2010 and provides information about the painting classes held by various licensees.   Defs.' Hearing Ex. 7, at 1, 28; Doc. No. 114, at 58:7–14, 61:4–13.   The website is available to anyone who has an Internet connection.   Doc. No. 114, at 63:15–17.   It provides access to calendars separately maintained by each licensee through CimpleBox, a third-party calendaring website.   *Id.* at 58:13–59:4.   The calendars created on CimpleBox are then embedded on the various wineandcanvas.com pages.   *Id.* at 58:20–23.   Each licensee "post[s] their own pictures of their artwork they're running in those cities" on their calendars.   *Id.* at 72:4–9.

Although W&C IP Holdings does not have a Facebook page, *id.* at 70:4–6, its licensees do, *id.* at 69:23–70:3.   W&C Development also has a Facebook page for its Indianapolis location.   *Id.* at 70:7–13.   Those entities put pictures of events and postings for upcoming events on their respective Facebook pages.   *Id.* at 70:25–71:16.   W&C IP Holdings has no role in licensees posting pictures on Facebook.   *Id.* at 99:16–25.

W&C IP Holdings sends people to licensees' launch events.   McCracken Depo. at 123:7–10.   It has a contracted artist instruct the licensees' first couple of classes, while one or two other support staff help the licensees "make sure they have a successful date as owners" and "get off to a

good start." *Id.* at 123:13–19.   These services are provided to the licensees as part of their licensing package.   *Id.* at 123:19–21.   After those initial classes, W&C IP Holdings does not hire independent artists for any licensee.   *Id.* at 138:6–15.

Each licensee then contracts with its own independent artists.   Doc. No. 114, at 96:8–14; McCracken Depo. at 72:16–17.   Those artists create artwork and lesson plans for the licensees with whom they contracted.   Doc. No. 114, at 96:21–24; McCracken Depo. at 72:17–18.   The artwork and lesson plans are subsequently submitted to McCracken, in her role as the Art Director for W&C IP Holdings.   McCracken Depo. at 67:21–25; 72:18–19.   The contracts between the licensees and their artists grant W&C IP Holdings the right to utilize the artists' artwork.   Doc. No. 114, at 98:19–99:2.

McCracken reviews the submitted artwork "to make sure the quality of the artwork is not going to hurt [the] brand."   McCracken Depo. at 72:19–23; *accord id.* at 68:1–4, 71:11–23.   She also ensures that the submitted paintings will take an adequate time to paint to fill the time in which the class was scheduled to run.   Doc. No. 114, at 122:8–13.   McCracken may provide suggestions to fix the artwork if quality or time issues arise.   Doc. No. 114, at 122:24–125:4.   She then uploads the artwork to CimpleBox.   McCracken Depo. at 68:4–7.   At that point, the licensees may access the artwork.   *Id.* at 68:4–7, 97:11–98:2.   Licensees may also select artwork from a portfolio maintained by McCracken.   Doc. No. 114, at 76:3–9, 121:20–122:4.   The licensees go into CimpleBox, create an event, and post the picture to the event.   McCracken Depo. at 72:24–73:1.   Once the licensee opens the event, it then goes live on the calendar on the licensee's page of the website.   *Id.* at 73:1–3.

Apart from approving the artwork and uploading it to CimpleBox, W&C IP Holdings and McCracken have no control over the artwork chosen by licensees and placed on their calendars.   Doc. No. 114, at 103:25–104:12; McCracken Depo. at 166:10–20.   McCracken has never put

anything on wineandcanvas.com or worked on the website, and she does not work on the licensees' calendars.   McCracken Depo. at 38:13–15, 128:21.

McCracken has visited Florida three times for work and eight times for vacation over the last five-to-six years.   *Id.* at 111:1–16.   She visited a licensee in Fort Myers for its launch event, at which she painted *The Red Tree*.   *Id.* at 114:5–115:10.   She also attended the openings for licensees in Orlando and Tampa.   *Id.* at 121:15–16, 122:11–14, 123:6.   McCracken taught the first two classes for WNC of Orlando, LLC, one of which used *The Red Tree*.   Doc. No. 114, at 140:9–16, 145:19–24.   She is also a manager for W&C Development.   Pls.' Hearing Ex. 25, at 3.

McCracken does not own a business in Florida.   McCracken Depo. at 154:6–7.   She does not personally sell anything in the state of Florida, and she does not have a Florida business license. *Id.* at 155:16–20, 156:7–8.   She is, however, the sole member of Boat & Breakfast Charters, LLC, an Indiana limited liability company that holds the title to a boat docked in Stuart, Florida.   Doc. No. 114, at 77:21–78:14, 92:13–14; McCracken Depo. at 30:11–14, 131:13–15.   The boat was purchased in Florida and is for McCracken's personal use.   McCracken Depo. at 44:16, 54:10–57:24.   McCracken has visited the boat four or five times since purchasing it.   *Id.* at 65:7–23. McCracken has never run an art class on the boat.   *Id.* at 94:21–22.   Scott visits Florida two-to-three times per year for vacation, which involves working on the boat.   Doc. No. 114, at 78:21–80:11.

Scott is the president, licensing director, and managing member for W&C IP Holdings.   *Id.* at 14:15–24:   As part of his job with W&C IP Holdings, Scott shows each licensee how to run a paint class through training in Indianapolis and sometimes through travel to the licensees.   *Id.* at 15:25–16:8.   He does not, however, run shows, schedule anything, or pick paintings.   *Id.* at 57:24–58:1.   He also signs the licensing agreements between W&C IP Holdings and the licensees.   *Id.* at 50:5–7.   He does not "have anything to do with the art side."   *Id.* at 83:17–18.   Moreover, he "[does]n't have anything to do with the Facebook stuff," "[does]n't look at Facebook at all," and

"ha[s] no earthly idea how to do anything on Facebook."   *Id.* at 72:13–14, 74:4–7.   Scott does not work for W&C Development, but he is listed as a manager.   *Id.* at 57:5–58:1.

Scott visited Florida with an artist for launch events in Jacksonville, Orlando, Fort Myers, and Fort Lauderdale.   *Id.* at 80:14–16, 86:22–25, 87:18–20.   At those events, he showed the licensees "how to do everything" and gave them moral support.   *Id.* at 81:1–6.   The licensees, however, ran the shows.   *Id.* at 81:4–6.   Scott visited for two events of a licensee in Jacksonville. Wathen Depo. at 30:9–13.   The first time was for the opening of the business, in which he "help[ed] . . . get everything in order."   *Id.* at 30:16–17.   The second time was for the studio grand opening "to help" and "make sure [they] were ready."   *Id.* at 30:17–21.   When Scott attended the first two events for WNC of Orlando, LLC, he showed Loerwald and her husband "how to set up the sound system, how to run wires properly, proper spacing, [and] proper lighting for an event." Doc. No. 114, at 155:7–9.

Loerwald is a member and manager of WNC of Orlando, LLC.   *Id.* at 133:12–24.   She became interested in opening a Wine and Canvas location after attending an event in Columbus, Ohio.   *Id.* at 138:3–5.   She listed Scott as a manager on the company annual reports filed with the Florida Secretary of State in 2014 and 2015 because he "informed [her] about Wine & Canvas when [she] was seeking information . . . of Wine & Canvas."   *Id.* at 138:6–15; *see also* Pls.' Hearing Ex. 28.   Loerwald did not list him as a manager for any other reason, and Scott did not tell her to list him as such.   *Id.* at 156:19–157:1.   She testified that Scott was not, in fact, a manager and that listing him as such was a mistake.   *Id.* at 157:9–17.

Loerwald did not decide which paintings to use for WNC of Orlando, LLC's first two classes; instead, "Wine and Canvas" chose those paintings, among which was *The Red Tree*, and set up the calendar for the first month.   *Id.* at 146:1–22.   Loerwald is unaware of the precise "Wine and Canvas" entity responsible for those acts.   *Id.* at 146:10–11.   The calendar for WNC of Orlando, LLC is accessible on wineandcanvas.com.   *Id.* at 150:20–151:3.   Loerwald also puts

advertisements together herself, and she testified that she does not ask for or need approval.   *Id.* at 149:17–22.   She received a file of clip art from a "Wine and Canvas" company, but she is not sure of the company's name.   *Id.* at 149:12–150:6.

The only members of SJ Wathen Bloomington, which operates in Bloomington, Indiana, are Sarah Wathen and her husband, Joshua Michael Wathen.   Wathen Depo. at 10:7–8, 45:8–13; Pls' Ex. 32 (SJ Wathen Bloomington's response to Interrogatory No. 2).   Sarah Wathen works out of her home in Jacksonville.   *See* Wathen Depo. at 20:14–16; Doc. No. 36 ¶ 11.   While there, she books events and answers phone calls and emails for SJ Wathen Bloomington.   Wathen Depo. at 20:3–10, 21:6–11.   On behalf of SJ Wathen Bloomington, she also posts events to the online calendar from home.   *Id.* at 25:25–26:12.   She submits her biannual business reports to Indiana from her home in Florida.   *Id.* at 41:10–42:5.   Sarah Wathen, her husband, and a studio manager are the administrators for SJ Wathen Bloomington's Facebook page.   *Id.* at 27:11–21.   Sarah Wathen occasionally posts to that Facebook page from Florida.   *Id.* at 28:3–7.

Sarah Wathen and her husband decide the artwork to be placed on the SJ Wathen Bloomington calendar for public events.   *Id.* at 22:9–12.   For private events, the individual hosting the event picks the painting from the "Wine & Canvas" portfolio.   *Id.* at 22:12–15.   Wathen also chooses paintings from the "Wine and Canvas" portfolio.   *Id.* at 22:17–25.

B.      *Duncanson.*

Duncanson has been a resident of Florida for at least the past five years.   Doc. No. 114, at 159:23–160:5.   She is a full-time artist who, through her company, sells original paintings directly on her websites, licenses her artwork to companies for placement on products, and sells prints through print-on-demand websites.   *Id.* at 160:10–25; 214:12–18.   She has registered ownership of the following works with the U.S. Copyright Office: *Bubbling Joy Collection* (VA 1-860-451), *Fine Wine* (VA 1-872-069), *Spring Shine* (VA 1-872-068), *Twisting Love 2007* (VA 1-872-086), *Twisting Love 2011* (VA 1-872-071), and *Birds of a Feather* (VA 1-872-072).   Doc. No. 36 ¶ 18.

Duncanson has also registered *Tropical Energy* (VA0001860474) and *Blue Depth* (VA0001860474) as part of a collection titled "Published Paintings 2006."   *Id.*

After a number of businesses copied her art and used it in their classes, Duncanson periodically used Google to search "paint party studios."   Doc. No. 114, at 162:3–9.   In April 2012, Duncanson came across an image of a W&C Development class in which her painting *Blue Depth* was being taught.   *Id.* at 162:10–12, 163:3–7.   By following a series of links, she reached wineancanvas.com, where she learned of other "Wine & Canvas" locations and found instances of alleged infringement on some locations' calendars and Facebook pages.   *Id.* at 162:12–23.   Duncanson sent a cease-and-desist email in April 2012 "to all of the e-mails that were listed on the wineandcanvas.com Contact page."   *Id.* at 186:22–187:12.   She sent a second email in February 2013.   *Id.* at 187:22–188:13.

W&C Development has used paintings similar to Duncanson's *Fine Wine*, *Twisting Love*, and *Blue Depth* at its events in Indianapolis.   Pls.' Hearing Ex. 25, at 8–11.   Duncanson also states that her painting *Spring Shine* appeared on some licensees' calendars, although she did not identify the precise licensees.   Doc. No. 114, at 206:3–4.   She claims that *Spring Shine* and *Birds of a Feather* were used "by more than one location."   *Id.* at 206:22–207:2.   Scott also testified that some artists outside of Florida copied Duncanson's artwork from Pinterest.   *Id.* at 124:18–126:17.   He did not, however, know the identities of the licensees with whom those artists had contracted.   *Id.* at 126:11–17.

After W&C Development brought a defamation suit against her in another court, Duncanson discovered that the Facebook page for "the Indianapolis location" displayed an image with her painting *Twisting Love*.   *Id.* at 197:7–12.   In 2014, Duncanson found her *Birds of a Feather* painting on "the Indianapolis calendar on wineandcanvas.com."   *Id.* at 204:20–205:13; *accord id.* at 222:4–10.

C.      *Wiseman.*

Wiseman is an artist who has no personal association with the state of Florida.   Wiseman Depo. at 13:19–21; *see also* Doc. No. 114, at 216:9–19.   She has registered her painting *Red Bonsai Rain* (VAu 1-141-493) with the U.S. Copyright Office.   Doc. No. 36 ¶ 19.   Wiseman contends that the painting *The Red Tree* is an unauthorized reproduction of *Red Bonsai Rain*.   *See* Doc. No. 36 ¶ 51(bbb); Wiseman Depo. at 10:5–14, 45:1–13.

W&C Development, as well as "Wine and Canvas" licensees in Orlando, Jacksonville, and Tampa, and other locations, have used *The Red Tree* during their classes.   McCracken Depo. at 164:23–165:6; Doc. No. 114, at 74:22–75:3.   SJ Wathen Bloomington has used *The Red Tree* on at least three occasions.   Pls.' Hearing Ex. 32, at 7.   As noted above, McCracken has also painted *The Red Tree* at several launch events in Florida.   Wiseman believes that, based on her review of the "Wine & Canvas" website, "almost every single Wine & Canvas location across the entire country has used [her] painting."   Wiseman Depo. at 45:10–13.   Scott also posited that "most" of the Florida licensees used *The Red Tree*.   Doc. No. 114, at 127:7–10.

## III.      ANALYTICAL STANDARD.

The United States Court of Appeals for the Eleventh Circuit directs this Court to look to the Florida long-arm statute in this copyright infringement case to determine whether it can exercise specific personal jurisdiction over non-resident defendants. *Cable/Home Commc'n Corp. v. Network Prods, Inc.*, 902 F.2d 829, 856 (11th Cir. 1990).   Section 48.193(1), Florida Statutes, provides the bases on which this Court may exercise specified personal jurisdiction.   If the Court finds that it can exercise specific personal jurisdiction under the Florida long-arm statute, then the Court must then "analyze this long-arm jurisdiction under the due process requirements of the federal constitution."   *Id.* at 857.

Florida law also provides that this Court may exercise general personal jurisdiction over a non-resident defendant "who is engaged in substantial and not isolated activity within [Florida], . . .

whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). Florida courts have held that the term "substantial and not isolated activity" means "continuous and systematic general business contact" with Florida. *See, e.g., Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006). "The reach of this provision extends to the limits on personal jurisdiction imposed by the Due Process Clause." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010).

In the context of a motion to dismiss in which an evidentiary hearing is held, a plaintiff must prove personal jurisdiction by a preponderance of the evidence. *See, e.g., Grenier v. Marlow Yachts, Ltd.*, No. 8:11-cv-2083-JDW-TGW, 2012 U.S. Dist. LEXIS 139479, at *2–3 (M.D. Fla. Sept. 27, 2012); *Tommy Bahama Grp., Inc. v. Eagle*, No. 3:09-cv-641-J-32JRK, 2010 U.S. Dist. LEXIS 86469, at *4 (M.D. Fla. Aug. 23, 2010). While a court may accept as true the uncontested allegations of the complaint, *see Nida Corp. v. Nida*, 118 F. Supp. 2d 1223, 1227 (M.D. Fla. 2000), it need not accept legal conclusions or those facts that are not well-pled, *see Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (noting that "*only* the well pled facts of plaintiff's complaint . . . must be accepted as true" (emphasis added)).

## IV.   DISCUSSION.

To determine whether a federal court has personal jurisdiction over a non-resident defendant, a district court must undertake a two-part analysis. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). First, the court "must determine whether the Florida long-arm statute provides a basis for personal jurisdiction." *Id.* If so, the court must then determine whether the defendant has sufficient minimum contacts with Florida so that the exercise of jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment. *Id.* A court analyzes personal jurisdiction as it relates to each defendant separately. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

When a defendant challenges a court's exercise of jurisdiction, the plaintiff bears the ultimate burden of establishing that the two-part inquiry is satisfied. *See Oldfield v. Pueblo de*

*Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009).   W&C IP Holdings, W&C Development, Scott, McCracken, and SJ Wathen Bloomington each argue that the Court lacks personal jurisdiction over them.   As was noted previously, Plaintiffs have offered shifting bases for the exercise of the Court's jurisdiction during the pendency of the Motion.   Accordingly, I will address only those bases identified in Plaintiffs' post-hearing brief, *see* Doc. No. 116, which is the most recent articulation of their jurisdictional theories.   I will assess these bases with respect to each Defendant separately.

A.   *W&C IP Holdings.*

Plaintiffs first argue that W&C IP Holdings is subject to the Court's general jurisdiction. Doc. No. 116, at 15–16.   They also each raise separate arguments that W&C IP Holdings is subject to the Court's specific jurisdiction.   *Id.* at 3–5, 7.   I will address Plaintiffs' contentions in turn.

1.   The Court Does Not Have General Jurisdiction over W&C IP Holdings.

Plaintiffs both argue that W&C IP Holdings is subject to general jurisdiction under section 48.193(2), Florida Statutes.   Under that provision of Florida's long-arm statute, a Florida court may exercise jurisdiction over a "defendant who is engaged in substantial and not isolated activity within [Florida], . . . whether or not the claim arises from that activity."   Fla. Stat. § 48.193(2).   As discussed above, "Florida courts have held the term 'substantial and not isolated activity' used in § 48.193(2) means 'continuous and systematic business contact' with Florida, a term used by the Supreme Court . . . to determine whether general jurisdiction was permissible under the Due Process Clause."   *Snow*, 450 F.3d at 1318.

The standard is exacting: "[T]he inquiry . . . is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'"   *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (second alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).

In *Daimler*, the plaintiffs sued a German corporation in California concerning incidents that occurred in Argentina.   134 S. Ct. at 751–52.   The plaintiffs argued that the district court could exercise general jurisdiction over the defendant corporation based on the contacts of its subsidiary with California.   *Id.* at 752.   The subsidiary was the largest supplier of luxury vehicles to the California market, its California sales accounted for 2.4% of the defendant's worldwide sales, and it had multiple California-based facilities, including a regional office, vehicle preparation center, and classic center.   *Id.*   The Court noted that, for a corporation, the place of incorporation and principal place of business are where it is "essentially at home," and are paradigm bases for jurisdiction.   *Id.* at 760.   Neither the defendant nor its subsidiary, however, were incorporated or had their principal places of business in California.   *Id.* at 761.

The *Daimler* Court added that "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State" only in an "exceptional case."   *Id.* at 761 n.19.   The Supreme Court determined that, even with the subsidiary's contacts attributed to the defendant, the California contacts were still "slim" and did not constitute such an exceptional case.   *Id.* at 760, 762.   The Court added that "[a] corporation that operates in many places can scarcely be deemed at home in all of them.   Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States."   *Id.* at 762 n.20.   Accordingly, the Court found that the defendant was not subject to general jurisdiction in California.   *Id.* at 762.

W&C IP Holdings is incorporated in Indiana and has its principal place of business in Indiana.   Doc. No. 36 ¶ 6; Doc. No. 114, at 14:25–15:14, 18:14–18, 55:10–13.   The record does not indicate that W&C IP Holdings has offices, staff, or any other lasting physical presence in Florida, or that W&C IP Holdings is licensed to do business in Florida.   Instead, W&C IP Holdings has entered into licensing agreements with five entities operating in Florida, and receives royalty fees and reports from them.   Doc. No. 114, at 15:17–16:23.   A number of courts have rejected that

- 15 -

such activities confer general jurisdiction wherever a licensee conducts business. *GurglePot, Inc. v. New Shreve, Crump & Low LLC*, No. C13-6029 RBL, 2014 U.S. Dist. LEXIS 82512, at *8 (W.D. Wash. June 17, 2014); *Eco Pro Painting, LLC v. Sherwin-Williams Co.*, 807 F. Supp. 2d 732, 736–37 (N.D. Ill. 2011); *Lab Corp. of Am. Holdings v. Schumann*, 474 F. Supp. 2d 758, 763 (M.D.N.C. 2006); *see also Hard Candy, LLC v. Hard Candy Fitness, LLC*, No. 13-23705-CIV-ALTONAGA/O'Sullivan, 2015 U.S. Dist. LEXIS 67479, at *48 (S.D. Fla. May 13, 2015) (finding no general jurisdiction when a defendant received $269,584.83 in royalties from goods sold in Florida).

The record also indicates that W&C IP Holdings sent a contracted artist to instruct those five licensees "first couple classes," as well as support staff to assist with set-up. McCracken Depo. at 123:13–21. Significantly, however, the *Daimler* Court found that the operation of three facilities in California, including a regional office, was insufficient to render the defendant in that case "essentially at home" in California. 134 S. Ct. at 752, 760–62. The Eleventh Circuit has also noted that "[g]eneral jurisdiction has been found lacking even where a company had employees, agencies and salespeople regularly in the forum." *Associated Transp. Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*, 197 F.3d 1070, 1075 (11th Cir. 1999). In light of those holdings, the sending of individuals to Florida for the first couple classes of the Florida licensees — acts which, being limited to initial classes, are necessarily infrequent — does not warrant the exercise of general jurisdiction over W&C IP Holdings.

Plaintiffs also argue that W&C IP Holdings "approves Florida licensees' artwork each month." However, a licensor may maintain a significant measure of quality control over a licensee that engages in business in a forum state, yet still lack sufficient minimum contacts with that state. *Eco Pro Painting*, 807 F. Supp. 2d at 737; *Sunshine Kids Found. v. Sunshine Kids Juvenile Prods., Inc.*, No. H-09-2496, 2009 U.S. Dist. LEXIS 117986, at *20-24 (S.D. Tex. Dec. 17, 2009). The record indicates that the approval process for licensees' artwork is intended "to make sure the quality

of the artwork is not going to hurt [the] brand."   McCracken Depo. at 72:19–23.   The record does not indicate, however, that W&C IP Holdings exercises any control over a licensee's sales activities.

The licensing agreements do provide that W&C IP Holdings will obtain ownership rights to certain categories of artwork and trademarks created by licensees under the agreement.   Defs.' Hearing Ex. 7 ¶¶ 2.4–.5, 3.1, 3.3, 3.4.   The record does not indicate how frequently W&C IP Holdings has *actually* obtained ownership of such works from entities operating in Florida under the agreements.   Even so, such contractual arrangements do not afford a sufficient basis for general jurisdiction.   *Cf. Associated Transp.*, 197 F.3d at 1075 ("[A] party's purchases in the United States are never enough to justify jurisdiction."); *see generally Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 418 (1984) ("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant . . . jurisdiction over a non-resident corporation in a cause of action not related to those purchase transactions.").

W&C IP Holdings also operates wineandcanvas.com, a website accessible to Florida residents.   Defs.' Hearing Ex. 7, at 1, 5, 28; Doc. No. 114, at 63:15–17.   In the context of general jurisdiction, the Eleventh Circuit has held that "the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction it that forum." *Fraser*, 594 F.3d at 847 (quoting *McBee v. Delica Co.*, 417 F.3d 107, 124 (1st Cir. 2005)) (internal quotation marks omitted).   While such a presence is, in a sense, continuous, the resultant contacts with Florida are "not in any way substantial."   *Id.* (quoting *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002)) (internal quotation marks omitted). Plaintiffs have offered no evidence that W&C IP Holdings conduct sales through the website or that the website is anything other than passive.

To be sure, W&C IP Holdings has contacts with Florida, some of which — like its website — are even continuous.   The Court's inquiry, however, must focus not merely on whether continuous and systematic contacts exist, but whether those contacts are "so continuous and

systematic as to render [it] essentially at home in the forum State.'"   *Daimler*, 134 S. Ct. at 761.

The contacts reflected by the record — both individually and collectively — are not of such a nature

that W&C IP Holdings is "at home" in Florida.   *See generally Monkton Ins. Servs., Ltd. v. Ritter*,

768 F.3d 429, 432 (5th Cir. 2014) ("It is . . . incredibly difficult to establish general jurisdiction in

a forum other than the place of incorporation or principal place of business.").   Indeed, the contacts

presented here are even less substantial than those deemed "slim" in *Daimler*.   Accordingly, I

recommend that the Court find that W&C IP Holdings is not subject to general jurisdiction in

Florida.

> ### 2.   The Court Has Specific Jurisdiction over W&C IP Holdings with Respect to Wiseman's Claims, but Not Duncanson's Claims.

Having recommended that the Court find that it cannot exercise general jurisdiction over

W&C IP Holdings, I next must evaluate whether the exercise of specific jurisdiction over W&C IP

Holdings is warranted.   As will be discussed subsequently, the Court cannot exercise specific

jurisdiction over W&C IP Holdings with respect to Duncanson's claims.   It can, however, exercise

specific jurisdiction over W&C IP Holdings for Wiseman's claims.

> #### a.   *The Court Does Not Have Specific Jurisdiction Over W&C IP Holdings With Regard To Duncanson's Claims.*

Duncanson asserts in her post-hearing brief that the Court has jurisdiction over her claims

against W&C IP Holdings under section 48.193(1)(a)(2) because it committed a tortious act within

the state of Florida.   Doc. No. 116, at 7–11.   Duncanson contends that W&C IP Holdings, through

its art director, "approved licensees' artwork uploaded to CimpleBox (accessible to public), which

artwork infringed Duncanson's . . . copyrights."   *Id.* at 9.   Duncanson also asserts that W&C IP

Holdings "maintained unauthorized copies of Ms. Duncanson's artwork in its portfolio for licensees

to use."   *Id.* at 9.   While authority does exist suggesting that the addition and maintenance of an

infringing work in a collection that is distributed publicly constitutes infringement, *see Hotaling v.*

*Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997), a claim on that basis falls outside of the scope of the complaint as currently pled.

While it is true that Duncanson alleged in the amended complaint that "Defendant(s) place an unauthorized reproduction of one of the [copyrighted works] on its/their website calendar — located at www.wineandcanvas.com — in an effort to advertise the upcoming class," Doc. No. 36 ¶ 37, record evidence indicates that W&C IP Holdings does not publish the calendars, Doc. No. 114, at 60:13–16. W&C IP Holdings also does not pick the artwork that goes on calendars and has nothing to do with licensees posting pictures on calendars. Doc. No. 114, at 99:8–24. Plaintiffs' amended complaint does not contain any allegations that W&C IP Holdings's approval of artwork uploaded to CimpleBox or maintenance of unauthorized copies of Duncanson's artwork in a portfolio constituted infringement.

Without such allegations, I recommend that the Court find that the exercise of jurisdiction is not proper over W&C IP Holdings as to Duncanson's claims on the newly asserted basis. *See, e.g.*, *Segregated Portfolio 164, Inc. v. IS Agency, Inc.*, No. 8:13-cv-694-T-33TGW, 2013 U.S. Dist. LEXIS 152236, at *11 (M.D. Fla. Oct. 23, 2013) ("In the absence of alleged facts sufficient to subject Defendants to Florida's long-arm statute, the Court cannot properly exercise personal jurisdiction over [Defendants]."); *Wallack v. Worldwide Mach. Sales, Inc.*, 278 F. Supp. 2d 1358, 1364 (M.D. Fla. 2003) ("The plaintiff is required to *plead* sufficient material facts to form a basis for in personam jurisdiction.") (emphasis added). To hold otherwise would countenance a shifting-sands approach to the personal jurisdiction inquiry, rather than a focus on the scope and allegations of the complaint itself. Given Duncanson's failure to plead a claim on these bases, I recommend that the Court determine that the exercise of specific jurisdiction over her direct, contributory, or vicarious infringement claims is not warranted. Accordingly, Duncanson's claims against W&C IP Holdings are due to be dismissed.

        b.     *The Court Can Exercise Specific Jurisdiction Over W&C IP Holdings*
           *For Wiseman's Claims.*

Although specific jurisdiction over W&C IP Holdings is unwarranted with respect to Duncanson's claims, the record does support the exercise of specific jurisdiction for Wiseman's claims. Such jurisdiction is justified under both Florida's long-arm statute and the Due Process Clause.

        i.     <u>Under Section 48.193(1)(a)(2), The Court Has Long-Arm Jurisdiction Over W&C IP Holdings For Wiseman's Claims.</u>

Wiseman contends that the Court may exercise specific jurisdiction over her claims against W&C IP Holdings under section 48.193(1)(a)(1) and section 48.193(1)(a)(2). Because Wiseman presents circumstances falling within the ambit of section 48.193(1)(a)(2), I will not address the issue of whether section 48.193(1)(a)(1) is also applicable.

Copyright infringement is a tortious act within the meaning of section 48.193(1)(a)(2). *See Cable/Home Commc'n Corp.*, 902 F.2d at 856–57. McCracken, in her capacity as W&C IP Holdings's Art Director, has visited Florida on three occasions for work over the past five-to-six years. McCracken Depo. at 111:1–16. During one of those visits, McCracken painted *Red Tree* at the launch event for a licensee in Fort Myers. *Id.* at 114:5–115:10. During another visit, she taught *The Red Tree* in Orlando. Doc. No. 114, at 145:19–24. Wiseman contends that *Red Tree* is an unauthorized reproduction of her painting *Red Bonsai Rain*. *See* Doc. No. 36 ¶ 51(bbb). Wiseman has, therefore, made a sufficient showing, for purposes of the long-arm inquiry, that W&C IP Holdings — through its agent, McCracken — committed tortious acts within the State of Florida.

        ii.     <u>The Exercise Of Jurisdiction Over W&C IP Holdings For Wiseman's Claims Comports With Due Process Requirements.</u>

I must next assess whether the exercise of jurisdiction over W&C IP Holdings for Wiseman's claims would comply with the Due Process Clause of the Fourteenth Amendment. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999). In specific jurisdiction cases, courts apply a three-

part test for minimum contacts, "which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the non-resident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, 'a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice.'" *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

The first prong of the minimum-contacts test is satisfied, given W&C IP Holdings's contacts with Florida, through its agent. Specifically, McCracken's painting and teaching *The Red Tree* at multiple locations in Florida, which are the very acts that Wiseman contends constitute infringement.

With respect to the second prong, "[u]nder the minimum contacts test for purposeful availment, we assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that defendant should reasonably anticipate being haled into court in the forum." *Id.* at 1357. The first requirement is largely redundant and, for the reasons noted above, is satisfied here. Second, W&C IP Holdings purposefully availed itself of the privileges of doing business within the forum by sending its agent to Florida to paint the allegedly infringing works in classes. Finally, given that the acts occurred within the state of Florida, W&C IP Holdings should reasonably anticipate being haled into Florida courts to answer for them.

- 21 -

Moreover, I conclude that the exercise of jurisdiction over Wiseman's claims against McCracken comports with "traditional notions of fair play and substantial justice."   The Eleventh Circuit has made clear that "a purposeful journey to Florida for a purpose related to the litigation has been considered a deliberate choice placing defendants on notice that they were subject to suit in Florida."   *Cable/Home Commc'n. Corp.*, 902 F.2d at 859.   W&C IP Holdings, through its agent, made such journeys when the agent traveled to Florida to paint *The Red Tree*.   Accordingly, I recommend that Defendant's motion to dismiss Wiseman's claims against W&C IP Holdings for lack of personal jurisdiction be denied.

> B.    *W&C Development.*

Duncanson and Wiseman each argue that the Court may exercise specific jurisdiction over W&C Development.   In the following sections, I will discuss each Plaintiff's arguments in turn.

> 1.    The Court Cannot Exercise Specific Jurisdiction over W&C Development, with Respect to Duncanson's Claims.

Duncanson argues that long-arm jurisdiction is appropriate over W&C Development under sections 48.193(1)(a)(2) and (6)(a), Florida Statutes.   While Duncanson is correct that section 48.193(1)(a)(2) affords a basis for personal jurisdiction over W&C Development, the exercise of such jurisdiction in this case would violate due process.

> a.    *Duncanson Has Established Long-Arm Jurisdiction Under Section 48.193(1)(a)(2), But Not Under Section 48.193(1)(a)(6)(a).*

> i.    Section 48.193(1)(a)(6)(a).

Duncanson argues that W&C Development is subject to this Court's specific jurisdiction under section 48.193(1)(a)(6)(a).   Doc. No. 116, at 11–12, 13-15.   Under that provision, a defendant is subject to long-arm jurisdiction if it "caus[es] injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury . . . [t]he defendant was engaged in solicitation or service activities within [Florida]." Fla. Stat. § 48.193(1)(a)(6)(a).

In her post-hearing brief, Duncanson contends that W&C Development "was engaged in solicitation in Florida" because it "licensed the Wine and Canvas business concept to licensees," including locations in Florida.  Doc. No. 116, at 14.  Duncanson, however, has pointed to no record evidence that that W&C Development had a licensing relationship with *any* Florida entity. Although Duncanson argues that a February 21, 2013 verified complaint from another case states that W&C Development "license[d] the [Wine and Canvas] concept to third parties desiring to operate a WC business," Pl.'s Hearing Ex. 30 ¶ 6, such a fact in no way establishes that W&C Development licensed to any party *in Florida*.   In fact, Duncanson undercuts her own argument in the same brief when she argues that "[W&C IP Holdings] entered into licensing agreements with entities in Florida: WNC of Orlando, LLC; WNC of Jacksonville, LLC; WNC of Tampa, LLC; WNC of Fort Lauderdale, LLC; and WNC of Fort Myers, LLC."   Doc. No. 116, at 4 (citing Doc. No. 114, at 15:1–22).   Moreover, the record evidence establishes that the only licensing agreements entered into by W&C Development were with W&C IP Holdings and SJ Wathen Bloomington, LLC, neither of which are Florida entities.  Doc. No. 114, at 39:3–18.   No record evidence indicates that those agreements were solicited in Florida.

Even if the record supported Duncanson's contention, a court may not exercise specific jurisdiction under section 48.193(1)(a)(6)(a) when there is "no connection between plaintiff's alleged injury and [defendant]'s solicitation and service activities in Florida."  *Crowe v. Paragon Relocation Res., Inc.*, 506 F. Supp. 2d 1113, 1122 (N.D. Fla. 2007); *accord Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 894 (11th Cir. 1983) (noting that the solicitation provision of Florida's long-arm statute permits jurisdiction if "the defendant was engaged in solicitation or service activities in Florida *which resulted in the injury*") (emphasis added).  Duncanson contends that W&C Development used Duncanson's artwork at paint parties in Indianapolis, posted unauthorized copies of her artwork on its website, and instructed students to paint copies of those works at the paint parties.  Doc. No. 116, at 14.  Duncanson completely fails

to explain, however, how those out-of-state acts would have any possible connection to licensing agreements with separate entities in Florida.  Moreover, at least one court has found that the solicitation-prong on Florida's long-arm statute does not permit jurisdiction over copyright claims.  *See Minsurg Int'l, Inc. v. Frontier Devices, Inc.*, No. 8:10-cv-1589-T-33EAJ, 2011 U.S. Dist. LEXIS 37967, at *14–16 (M.D. Fla. Apr. 7, 2011).

For all the foregoing reasons, section 48.193(1)(a)(6)(a) is not a valid basis for the exercise of long-arm jurisdiction over W&C Development.

ii.      Section 48.193(1)(a)(2).

Duncanson further contends that W&C Development "committed a tortious act within Florida by uploading artwork online."  Doc. No. 116, at 11.  Duncanson testified that "the Indianapolis calendar on wineandcanvas.com" displayed her copyrighted work, *Birds of a Feather*.  Doc. No. 114, at 204:20–205:4.  She did not, however, know the entity that operated the calendar she viewed.  Doc. No. 114, at 205:5–12.  Despite that, I am satisfied the record evidence establishes that W&C Development committed the complained-of act.  Scott testified that W&C Development owns "the Indianapolis location."  Doc. No. 114, at 29:13–15.  Scott also testified that individuals could go to wineandcanvas.com, pull up the licensee city, and go to the location's calendar.  Doc. No. 114, at 59:6–16.  Duncanson testified that she accessed the calendar displaying *Birds of a Feather* by going to wineandcanvas.com, following the "Locations" tab, and clicking "Indianapolis."  Doc. No. 114, at 205:5–12.  Viewed together, this record evidence indicates that W&C Development operated the calendar that displayed *Birds of a Feather*.  Because Duncanson alleges that such a display infringed her copyright, W&C Development's actions fall within the ambit of section 48.193(1)(a)(2).

I also conclude that such an act meets the requirement that it occur "within" Florida by virtue of its presence on the website.  In *Licciardello v. Lovelady*, 544 F.3d 1280, 1282 (11th Cir. 2008), the Eleventh Circuit addressed whether a Florida court had jurisdiction over a defendant who

allegedly infringed a trademark on a website created by a defendant in Tennessee.  *Id.* at 1283. The Eleventh Circuit noted that the tortious-act provision of Florida's long-arm statute "permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state."  *Id.* (citing *Posner*, 178 F.3d at 1216).  The court determined, therefore, that although the website was created in Tennessee, "the alleged infringement clearly also occurred in Florida by virtue of the website's accessibility in Florida."  *Id.*  District courts have extended *Licciardello*'s reasoning to claims of copyright infringement.  *See Smith v. Trans-Siberian Orchestra*, 728 F. Supp. 2d 1315, 1322–23 (M.D. Fla. 2010) ("*Smith I*").

The record further shows that W&C Development has used paintings similar to Duncanson's *Fine Wine*, *Twisting Love*, and *Blue Depth* at its events in Indianapolis.   Pls.' Hearing Ex. 25, at 8–11.  Long-arm jurisdiction also embraces these alleged instances of copyright infringement, which although committed outside Florida, caused injury to Duncanson in Florida.  *See Exist, Inc. v. Woodland Trading, Inc.*, No. 14-cv-61354-Civ-Scola, 2015 U.S. Dist. LEXIS 24872, at *2–4 (M.D. Fla. Mar. 2, 2015) (citing *Posner*, 178 F.3d at 1216).

Accordingly, W&C Development is subject to long-arm jurisdiction under section 48.193(1)(a)(2).

> b.   *The Exercise Of Specific Jurisdiction Over W&C Development For Duncanson's Claims Would Not Comport With The Due Process Clause.*

Having recommended that the Court conclude that Florida's long-arm statute confers specific jurisdiction over Duncanson's claims of copyright infringement, I must next assess whether the exercise of jurisdiction in this case would comply with the Due Process Clause of the Fourteenth Amendment.  *Posner*, 178 F.3d at 1214.   As noted previously, this assessment turns on the three-part minimum-contacts test.   The requirement that the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum is satisfied, at least in part, in this case.   W&C

Development allegedly posted infringements of Duncanson's *Birds of a Feather* on its online calendar, which was accessible in Florida.

Duncanson has not established, however, that W&C Development purposefully availed itself of the privilege of conducting activities in Florida.   In intentional tort cases, as an alternative to the traditional purposeful-availment test, a court may apply the effects test first set forth in *Calder v. Jones*, 465 U.S. 783 (1984), to determine whether purposeful availment has occurred.   *See Mosseri*, 736 F.3d at 1356.   In *Calder*, the respondent, who lived and worked in California, brought a libel suit in California against a reporter and editor of a national newspaper.   465 U.S. at 785.   Both petitioners resided in Florida.   *Id.* at 785–86.   The reporter, who wrote the first draft of the allegedly libelous article, conducted most of his research in Florida, but relied on calls to sources in California for information and frequently traveled to California for business.   *Id.* at 785.   The newspaper's editor had only been to Florida twice for unrelated matters.   *Id.* at 786.   However, he reviewed and approved the initial evaluation of the article's subject matter, edited the article in its final form, and declined to print a retraction.   *Id.*   Those petitioners claimed that they did not have sufficient "minimum contacts" with Florida to support the exercise of specific jurisdiction.   *Id.* at 784–85.

The *Calder* Court disagreed, noting that "[i]n judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"   *Id.* at 788 (quoting *Shaffer v. Heitner*, 533 U.S. 186, 204 (1977)).   The allegedly libelous story concerned the California activities of a California resident, "impugned the professionalism of an entertainer whose television career was centered in California," and was drawn from California sources.   *Id.* Moreover, the brunt of the emotional and reputational harm was suffered in California.   *Id.* at 789. Accordingly, "California [wa]s the focal point *both* of the story and of the harm suffered."   *Id.*   The Court determined, therefore, that the publishing of the story was more than "mere untargeted negligence" and that the actions "were expressly aimed at California."   *Id.*   The Court added that

> [Petitioners] knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the [newspaper] has its largest circulation.   Under the circumstances, petitioners must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article."

*Id.* at 789–90 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Accordingly, jurisdiction over the petitioners was proper in California "based on the 'effects' of their Florida conduct in California."   *Id.* at 789.

The Court expounded on *Calder* and the effects test in *Walden v. Fiore*, 134 S. Ct. 1115 (2014).   In *Walden*, the plaintiffs, who were California and Nevada residents, sued a Georgia police officer in a Nevada federal court based on actions he undertook while serving as a deputized Drug Enforcement Administration agency in a Georgia airport.   *Id.* at 1119–20.   The officer seized money carried by the plaintiffs who were in transit to Nevada, moved the cash to a secure location, and drafted an affidavit to establish probable cause for the forfeiture.   *Id.* at 1119.   The plaintiffs alleged that the officer's actions violated their Fourth Amendment rights.   *Id.*   The Court granted certiorari to determine whether the Nevada court could properly exercise jurisdiction over the officer.   *Id.*

The Court noted that "[f]or a State to exercise jurisdiction consistent with due process the defendant's suit-related conduct must create a substantial connection with the forum State."   *Id.* at 1121.   It then identified two aspects of this relationship that are necessary to the due process inquiry.   "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State."   *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). This requirement is premised on the notion that the due process limits on a state's adjudicative authority are aimed at protecting the liberty interests of non-resident defendants, not at the convenience of plaintiffs.   *Id.*   Consequently, "however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"   *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).   "Second,

[the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* "[T]he plaintiff cannot be the only link between the defendant and the forum." *Id.* These same principles apply when a case involves intentional torts. *Id.* at 1123.

The *Walden* Court then added that "the crux" of *Calder* was that "the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Id.* at 1123–24. The connection with California there was largely a function of the libel tort itself — the reputational injury would not have occurred but for the fact that the article was written for publication in California and was read by a large number of California citizens. *Id.* at 1124. For that reason, "the 'effects' caused by the defendants' article — *i.e.*, the injury to the plaintiff's reputation in the estimation of the California public — connected the defendant's conduct to *California*, not just to a plaintiff who lived there." *Id.* at 1124.

Applying all of the foregoing, the *Walden* Court determined that the Georgia police officer did not have sufficient minimum contacts with Nevada to justify the exercise of jurisdiction over him. *Id.* None of the officer's conduct occurred in Nevada. *Id.* He never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. *Id.* Accordingly, "when viewed through the proper lens — whether the *defendant's* actions connect him to the *forum* — [the officer] formed no jurisdictionally relevant contacts with Nevada." *Id.*

The Court also rejected an argument that the officer's knowledge of the plaintiffs' forum connections satisfied the "minimum contacts" inquiry, noting that such an approach "makes those connections 'decisive' in the jurisdictional analysis" and "obscures the reality that none of the petitioner's challenged conduct had anything to do with Nevada itself." *Id.* at 1125. The Court added that "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.*

Because no meaningful contacts existed between the office and Nevada, the Court determined that the exercise of jurisdiction did not satisfy the Due Process Clause.   *Id.* at 1126.

Duncanson has not established that W&C Development has sufficient meaningful contacts with Florida to comport with due process.   The only contact of W&C Development with Florida reflected by the record is that, by posting the infringement on its passive calendar, it allegedly injured Duncanson.[5]   As *Walden* makes clear, Duncanson's status as a Florida resident is insufficient to satisfy the due process inquiry.   134 S. Ct. at 1125.

Duncanson argues that her case presents circumstances similar to those presented in *Smith v. Trans-Siberian Orchestra*, No. 8:09-cv-1013-T-33EAJ, 2011 U.S. Dist. LEXIS 27115 (M.D. Fla. Mar. 3, 2011) ("*Smith II*"), and *Licciardello*, 544 F.3d 1280, in which courts found specific jurisdiction when defendants posted alleged infringements on websites accessible in Florida. Those cases, however, are distinguishable.   In *Smith II*, the Florida plaintiff offered evidence that an item resembling the copyrighted artwork was offered for sale on the defendant's website.   *See Smith II*, No. 8:09-cv-1013-T-33EAJ, 2011 U.S. Dist. LEXIS 27115, at *8–9.   In *Licciardello*, the defendant's website offered management-advice and career-assistance CD's for sale, and used the Florida plaintiff's trademarked name and picture to imply endorsement for the same.   *Id.* at 1282–83.   Such offers of sale, which were directed at Florida, created a meaningful connection between the defendant and the state of Florida that is not present in this case.   Here, Duncanson has offered no evidence that W&C Development sold products on its website, or that it has otherwise ever made sales to Florida residents.

"[T]he mere posting of an [infringement] on a website 'without more' is insufficient to demonstrate that [a defendant] purposefully aimed its activity toward Florida."   *DCS Real Estate*

---

[5] Duncanson does not argue how the use of *Fine Wine*, *Twisting Love*, and *Blue Depth* at events in Indianapolis reflect that W&C Development's actions created jurisdictionally relevant contacts with Florida beyond mere injury to a forum resident.   *Walden*, 134 S. Ct. at 1125–26.   Those acts, therefore, do not serve as jurisdictionally relevant contacts.

*Invs., LLC v. Bella Collina Events, LLC*, No. 5:14-cv-678-JSM-PRL, 2015 U.S. Dist. LEXIS 17282, at *9 (M.D. Fla. Feb. 12, 2015) (quoting *Licciardello*, 544 F.3d at 1287); *accord Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) (noting that, post-*Walden*, "'[o]ur inquiry boils down to this: has [defendant] purposefully exploited [the forum] market' beyond simply operating an interactive website accessible in the forum state and sending emails to people who may happen to live there?" (first and second alterations in original) (quoting *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011))); *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (noting that the fact that a party's "websites could be accessed anywhere, including Virginia, does not by itself demonstrate that the newspapers were intentionally directing their website content to a Virginia audience"); *Paws Aboard, LLC v. Didonato*, No. 8:11-cv-1978-T-33EAJ, 2012 U.S. Dist. LEXIS 52061, at *13–14 (M.D. Fla. Apr. 13, 2012) ("The fact that a web site might be accessible in the state does not necessarily mean that a defendant's activities were directed toward the state.").

Because such an informational website does not, by itself, create an adequate connection with Florida to establish purposeful availment of the benefits of Florida, the exercise of jurisdiction would violate the Due Process Clause.   Consequently, the Court should not exercise jurisdiction over W&C Development with regard to Duncanson's claims.[6]

2.   <u>The Court Does Not Have Specific Jurisdiction Over W&C Development For Wiseman's Claims.</u>

Wiseman argues that this Court has long-arm jurisdiction over W&C Development section 48.193(1)(a)(2) based on the commission of a tortious act in Florida.   Wiseman contends

---

[6] Duncanson mentions in passing that W&C Development posted *Birds of a Feather* on its website after the original complaint "put [W&C Development] on notice" of infringement.   Duncanson ignores, however, that the original complaint did not include *Birds of a Feather* as a work that had allegedly been infringed.   Regardless, the Supreme Court in *Walden* established that the minimum contacts inquiry is not satisfied simply because a plaintiff suffers "foreseeable harm" in a forum state, because such an approach "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." 134 S. Ct. at 1124–25.

that W&C Development posted *The Red Tree*, which is an unauthorized reproduction of her copyrighted work, on Facebook.   Doc. No. 116, at 12.   She further contends that W&C Development ran a class at which the unauthorized reproduction was taught and that a copy would have been displayed on W&C Development's calendar.   *Id.*   Wiseman supports these assertions not through evidence presented at the jurisdictional hearing, but rather through reliance on the allegations of her amended complaint.   *Id.* (citing Doc. No. 36 ¶¶ 46(j), 55).

I recommend that the Court find that the allegations in the amended complaint are not well-pled facts. *See Wenz*, 55 F.3d at 1505 ("[O]nly the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true.").   Rather, in the amended complaint Wiseman attributed conduct to Defendants or Defendant(s) rather than to W&C Development specifically.   Consequently, Wiseman has failed to present a sufficient basis to find that long-arm jurisdiction applies under the tortious-act provision.

Even were the Court to accept the allegations and find that the exercise of jurisdiction comports with Florida's long-arm statute, Wiseman still has not established sufficient minimum contacts to establish that the exercise of jurisdiction is consistent with the Due Process Clause. Wiseman is a resident of Utah, not Florida.   Accordingly, Wiseman must satisfy the traditional minimum contacts test for purposeful availment.   *Mosseri*, 736 F.3d at 1357.   Under that test, this Court must assess whether the Wine & Canvas IP Holdings, LLC's contacts with Florida "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum."   *Id.*

The only pertinent contact to which Wiseman points the Court is W&C Development's posting of allegedly infringing works on its website calendar and on Facebook.   Doc. No. 116, at 12.   However, W&C Development's use of a website that is "as accessible from Florida as [it is] from any other state or anywhere in the world where Internet access is available . . . does not amount

to 'purposeful availment' of conducting activities with Florida."  *Turi v. Stacey*, No. 5:13-cv-248-Oc-22PRL, 2014 U.S. Dist. LEXIS 181228, at *41 (M.D. Fla. Nov. 25, 2014); *accord Paws Aboard*, No. 8:11-cv-1978-T-33EAJ, 2012 U.S. Dist. LEXIS 52061, at *13–14.   Further, Wiseman has failed to show that W&C Development solicited Florida customers to its Indianapolis location through the website, or that the website is anything other than a passive vehicle.   Consequently, Wiseman has not established W&C Development's purposeful availment, and the exercise of personal jurisdiction over W&C Development with respect to Wiseman's claims would not meet the requirements of due process.

     *C.*    *Scott.*

Defendants argue that Scott is not subject to the Court's personal jurisdiction and that, in any event, he must be dismissed under the corporate-shield doctrine.   Plaintiffs argue that the Court may exercise both general and specific jurisdiction.   I will first discuss why the corporate-shield doctrine does not protect Scott on the record presented.   I will then address whether the Court should exercise general jurisdiction over Scott.   Finally, I will assess whether specific jurisdiction over Scott is appropriate with respect to the claims of either Plaintiff.

     1.    <u>The Court Should Not Dismiss the Claims Against Scott Under the Corporate-Shield Doctrine.</u>

As a threshold matter, Scott argues for the first time in his post-hearing brief that the Court should dismiss the claims against him and McCracken under Florida's corporate-shield doctrine. Doc. No. 117, at 8–9.   Even assuming the argument were timely raised and properly couched as a jurisdictional issue, his argument is without merit and has been expressly rejected by the Eleventh Circuit in similar circumstances.   In *Mosseri*, 736 F.3d at 1355, the Eleventh Circuit stated in a trademark action that, "under Florida law, th[e] corporate shield doctrine is inapplicable where the corporate officer commits intentional torts."   Because Plaintiffs allege that Scott committed the

intentional tort of copyright infringement, Scott's invocation of the corporate-shield doctrine fails *ab initio*.

2.   <u>The Court Should Not Exercise General Jurisdiction Over Scott.</u>

Plaintiffs also argue that the Court may exercise general jurisdiction under section 48.193(2). *Id.* at 16.   "[G]eneral jurisdiction over an individual may be based on that individual's activities as an employee on behalf of a corporation."   *May v. Needham*, 820 So. 2d 430, 431 (Fla. 4th Dist. Ct. App. 2002).   Scott visited Florida with an artist for launch events in Jacksonville, Orlando, and Fort Myers, and Fort Lauderdale.[7]   Doc. No. 114, at 80:14–16, 86:22–25, 87: 18–20.   At those events, he showed the licensees "how to do everything," including setting up sound systems, running wires properly, and establishing proper spacing and lighting.   Doc. No. 114, at 81:1–6; *id.* at 155:7–9. Scott also visited Florida two-to-three times a year to work on the boat held by Boat & Breakfast Charters, LLC.

The limited and infrequent contacts between Scott and Florida simply do not rise to the level of "substantial and not isolated" activity, so as to render Scott essentially "at home" in Florida.[8] *See, e.g.*, *Pathman v. Grey Flannel Auctions, Inc.*, 741 F. Supp. 2d 1318, 1323 (S.D. Fla. 2010) (finding a defendant's "two to three" annual business trips to Florida and occasional visits as a tourist insufficient for general jurisdiction); *Imaging Sci. Found., Inc. v. Kane*, No. 09-81288-CIV-MARRA, 2010 U.S. Dist. LEXIS 51072, at *23 (S.D. Fla. May 24, 2010) (determining that fourteen

---

[7] Plaintiffs claim in their post-hearing brief that Scott "*directed* at least 6 launch events in Florida" and that he was "personally engaged in their . . . instruction."   Doc. No. 116, at 16 (emphasis added).   They have, however, not pointed to any evidentiary support for those claims, and I discern no such support from the record.

[8] Plaintiffs suggest that Scott presents circumstances analogous to those identified in *Pizzabiocche v. Vinelli*, 772 F. Supp. 1245, 1249 (M.D. Fla. 1991).   *Pizzabiocche*, however, pre-dated the Supreme Court's decisions in *Daimler* and *Goodyear*, and did not address general jurisdiction under the standard set forth in those cases — i.e., whether the contacts were such that the defendant was "essentially at home" in Florida.   *See generally Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1387 (S.D. Fla. May 9, 2014) (noting that *Daimler* and *Goodyear* "appear to demand a heightened standard for conferring federal jurisdiction over foreign defendants").   Accordingly, I do not consider *Pizzabiocche* instructive.

visits to Florida in the capacity of an employee over ten years is "attenuated contact [that] does not meet the test for general jurisdiction"); *see also Harris v. Lloyds TSP Bank, PLC*, 281 F. App'x 489, 493–94 (6th Cir. 2008) (holding that sporadic visits by a defendant's employees to a state were "not the type of 'continuous and systematic conduct' required to support general jurisdiction over a defendant"). Indeed, it would be odd to find such conduct by an employee sufficient for general jurisdiction in Florida, when the Supreme Court in *Daimler* has found that the maintenance of a regional office in a state insufficient for general jurisdiction in that state. *See Daimler*, 134 S. Ct. at 752, 760–62. Accordingly, the exercise of general jurisdiction is not permitted under either the long-arm statute or the Due Process Clause.

> 3.  The Court Cannot Exercise Specific Jurisdiction over Scott with Respect to Duncanson's Claims.

Duncanson asserts that the Court may exercise long-arm jurisdiction over Scott under section 48.193(1)(a)(2) based on his commission of a tortious act. Doc. No. 116, at 7–11. She argues that Scott is liable for direct, contributory, and vicarious infringement because he "allowed continued use" of Duncanson's works by licensees in Fort Wayne, Columbus, Bloomington, South Bend, Cincinnati, Louisville, Sioux Falls, San Francisco, Chicago, Indianapolis, and in "several other" locations. Doc. No. 116, at 7, 9–11. Duncanson, however, has provided no evidence that Scott was involved in the alleged use of her work at any of the above locations.[9] Indeed, the record suggests precisely the contrary, as Scott testified that he does not "have anything to do with the art side." Doc. No. 114, at 83:17–18. Duncanson has presented no evidence that Scott was present at those locations when alleged infringements occurred or that he otherwise encouraged such infringements.

---

[9] Duncanson again cites to allegations of the amended complaint that are not well-pled and are not clearly attributable to Scott. As a result, they carry no weight in my analysis. *See Wenz*, 55 F.3d at 1505.

Even had Duncanson presented evidence to support the above contentions and establish satisfaction of the long-arm statute, the exercise of jurisdiction in this case still would not comply with the Due Process Clause.   Precisely *none* of the above-listed locations that Duncanson identified are located in Florida, and Duncanson has suggested no respect in which such wholly out-of-state acts, if they occurred at all, reflect that Scott purposefully availed himself of the benefits of *Florida*.   Indeed, the only apparent connection is that Duncanson, who suffered the alleged harm, is a resident of Florida.   As was noted previously, however, "mere injury to a forum resident is not a sufficient connection to the forum."   *Walden*, 134 S. Ct. at 1125.

The record simply contains no evidence indicating that the above acts reflected purposeful availment of the benefits of doing business in Florida or were such that Scott could have reasonably anticipated being haled into court in Florida to answer for them.   Accordingly, the Court should not exercise specific jurisdiction over Scott with respect to Duncanson's claims.

4.   <u>The Court Has Specific Jurisdiction Over Scott With Respect To Wiseman's Claims.</u>

Wiseman contends that the Court may exercise long-arm jurisdiction over Scott under sections 48.193(1)(a)(1) and (2).   I will first address Wiseman's contentions under each of those provisions.   I will then assess whether the exercise of jurisdiction over Scott would satisfy due process.

a.   *The Court Does Not Have Long-Arm Jurisdiction Over Scott Pursuant To Section 48.193(1)(a)(1).*

Wiseman argues that Scott, in his individual capacity, is subject to the Court's specific jurisdiction under section 48.193(1)(a)(1), which arises from operating, conducting engaging in, or carrying on a business venture in Florida of Having an office of agency in Florida.   Fla. Stat. § 48.193(1)(a)(1).   Wiseman relied on evidence that Scott visited "the launch events for Florida licensees in Jacksonville, Orlando, Fort Myers, Fort Lauderdale, and possibly Tampa."   Doc. No. 116, at 5.   In *Imaging Science Foundation, Inc. v. Kane*, No. 09-81288-CIV-MARRA, 2010

U.S. Dist. LEXIS 51072, at *1–3 (S.D. Fla. May 24, 2010), the plaintiff alleged that a defendant was subject to personal jurisdiction over its copyright infringement claim because the defendant "engaged in a business in Florida by virtue of serving as an employee, officer and director of the Plaintiff corporation."   The defendant moved to dismiss the claim for want of personal jurisdiction, claiming that long-arm jurisdiction under the business-activity provision does not apply to acts of a non-resident corporate employee performing acts in his corporate capacity.  *Id.* at *3, 13.   The court noted that "Plaintiff has failed to show that Defendant engaged in any acts in an individual capacity, as opposed to a corporate capacity, that could form the basis of jurisdiction over him." *Id.* at *17.   Consequently, the court found the business provision of the long-arm statute inapplicable.  *Id.* at *18.

The record here contains no evidence that Scott personally owns or operates an office in Florida, has a license to do business in Florida, or serves clients in Florida through personal business. *Cf. Mainline Info. Sys. v. Fordham*, No. 4-11-cv-137-SPM-WCS, 2011 U.S. Dist. LEXIS 55698, at *7–8 (N.D. Fla. May 24, 2011) (citing *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005)).   Although Wiseman claims that Scott is a member of WNC of Orlando, LLC, the record evidence makes clear that Loerwald listed him as such as a mistake and that Scott was not, in fact, a manager.   Doc. No. 114, at 157:9–17. Even if he were, though, that fact would still be an insufficient basis for the exercise of jurisdiction under the long-arm statute. *Cf. Newberry v. Rife*, 675 So. 2d 684, 685 (Fla. 2d Dist. Ct. App. 1996) ("The mere fact that one . . . is a director of a corporation is not the functional equivalent of doing business in the state.").

The record contains no evidence that Scott conducted business in Florida in his individual capacity, rather than as an employee of W&C IP Holdings.   Accordingly, section 48.193(1)(a)(1) does not permit the exercise of jurisdiction over Scott with respect to Wiseman's claims.

> **b.** *The Court Can Exercise Long-Arm Jurisdiction Over Scott Under Section 48.193(1)(a)(2).*

Wiseman also argues that section 48.193(1)(a)(2) justifies the exercise of jurisdiction because Scott "came to Florida to assist and supervise Florida licensees at launch events, using *Red Tree*, directly infringing Ms. Wiseman's artwork." Doc. 116, at 8 (citations omitted). Wiseman's assertion is supported by record evidence. Scott visited Florida with an artist for launch events in Jacksonville, Orlando, and Fort Myers, and Fort Lauderdale. Doc. No. 114, at 80:14–16, 86:22–25, 87: 18–20. At those events, he showed the licensees "how to do everything" and gave them moral support. *Id.* at 81:1–6. When Scott attended the first two events for WNC of Orlando, LLC, he showed Loerwald and her husband "how to set up the sound system, how to run wires properly, proper spacing, [and] proper lighting for an event." Doc. No. 114, at 155:7–9. Scott also visited for two events of a licensee in Jacksonville. Wathen Depo. at 30:9–13. The first time was for the opening of the business, in which he "help[ed] . . . get everything in order." Wathen Depo. at 30:16–17. The second time was for the studio grand opening "to help" and "make sure [they] were ready." Wathen Depo. at 30:17–21.

Wiseman contends that such acts constitute direct infringement, contributory infringement, and vicarious infringement. It is enough, for jurisdictional purposes, that Wiseman has pointed to acts, supported by record evidence, that she contends constitute the intentional tort of copyright infringement.[10] Accordingly, I recommend that the Court conclude that it may exercise long-arm jurisdiction over Scott with respect to Wiseman's claims.

---

[10] Whether the acts cited by Wiseman *actually* constitute infringement under any (or all) of the theories, is an issue suited for a motion to dismiss for failure to state a claim or a motion for summary judgment, not the present jurisdictional inquiry.

c.      *The Exercise Of Specific Jurisdiction Over Scott For Wiseman's Claims Comports With Due Process Requirements.*

The exercise of jurisdiction over Scott with regard to Wiseman's claims does not offend due process.   First, Scott's contacts in Florida — i.e., setting up and assisting with Florida events at which *The Red Tree* was painted  — are the acts that Wiseman contends constitute infringement.. Second, Scott purposefully availed himself of the privileges of doing business within the forum by making work trips to Florida to perform such acts.   Finally, given that the acts occurred within the State of Florida, Scott should reasonably anticipate being haled into Florida courts to answer for them.   Accordingly, Scott meets the minimum-contacts test.   *See Mosseri*, 736 F.3d at 1357.

Moreover, I conclude that the exercise of jurisdiction over Scott comports with "traditional notions of fair play and substantial justice."   Wiseman's claims are based on Scott's purposeful trips to Florida and the actions that he undertook during the trips, thereby placing him on notice that he would be subject to suit in Florida for those acts.   *Cable/Home Commc'n. Corp.*, 902 F.2d at 859.   Accordingly, I recommend that the Court find that it may exercise specific jurisdiction over Scott for Wiseman's claims.

D.      *McCracken.*

Like Scott, McCracken argues that she is protected from suit under the corporate-shield doctrine.   For the same reasons as I discussed with regard to Scott, however, McCracken may not invoke that doctrine to shield her from intentional torts — here, copyright infringement — she allegedly committed.   *See Mosseri*, 736 F.3d at 1355

McCracken also argues that the Court does not have personal jurisdiction over her.   Both Plaintiffs counter that the Court may exercise specific jurisdiction over McCracken under section 48.193(1)(a)(2), based on her commission of a tortious act in Florida.   While the Court should not exercise specific jurisdiction over McCracken with respect to Duncanson's claims, it should do so for Wiseman's claims.

1.    The Court Cannot Exercise Specific Jurisdiction over McCracken Concerning Duncanson's Claims.

Duncanson argues that long-arm jurisdiction may be exercised under section 48.193(1)(a)(2) because "McCracken[,] as art director, approved licensees' artwork uploaded to CimpleBox."   Doc. No. 116, at 9.   She contends that McCracken kept unauthorized reproductions in the W&C IP Holdings portfolio.   *Id.* at 10.   As was noted previously, however, a claim on that basis falls outside of the scope of the complaint as currently pled.   Indeed, the complaint does not include any allegations that McCracken approved, added, or maintained artwork in a portfolio.   Nor does it indicate that an infringement claim is being made on such a basis.   Without such allegations, I recommend that the Court find that it cannot exercise of jurisdiction over McCracken on that basis is proper.   *See, e.g.*, *Segregated Portfolio 164, Inc.*, No. 8:13-cv-694-T-33TGW, 2013 U.S. Dist. LEXIS 152236, at *11.

2.    The Court Should Exercise Specific Jurisdiction Over McCracken Concerning Wiseman's Claims.

The record evidence indicates that McCracken has infringed upon Wiseman's work in Florida.   McCracken has visited Florida on three occasions for work over the past five-to-six years. McCracken Depo. at 111:1–16.   During one of those visits, McCracken painted *Red Tree* at the launch event for a licensee in Fort Myers.   *Id.* at 114:5–115:10.   During another visit, she taught *The Red Tree* in Orlando.   Doc. No. 114, at 145:19–24.   As noted previously, Wiseman contends such paintings infringed on her copyright for *Red Bonsai Rain*.   Wiseman has, therefore, made a sufficient showing, for purposes of the Court's jurisdictional inquiry, that McCracken committed a tortious act within the State of Florida.

These Florida contacts also satisfy the minimum-contacts test for purposeful availment.   *See Mosseri*, 736 F.3d at 1357.   First, McCracken painting *The Red Tree* at multiple locations in Florida, which Wiseman contends was infringement.   Second, McCracken purposefully availed herself of the privileges of doing business within the forum by making trips to Florida to paint the

allegedly infringing works.   Finally, given that the acts occurred within the State of Florida, McCracken should reasonably anticipate being haled into Florida courts to answer for them.

The exercise of jurisdiction over McCracken also comports with "traditional notions of fair play and substantial justice."   By traveling to Florida to paint the alleged infringements, McCracken was on notice that she would be subject to suit in Florida for such paintings.   *Cable/Home Commc'n. Corp.*, 902 F.2d at 859.   Accordingly, the Court should exercise specific jurisdiction over McCracken with respect to Wiseman's claims.

### E.   *SJ Wathen Bloomington.*

Plaintiffs argue that this Court has general jurisdiction over SJ Wathen Bloomington under section 48.193(2).   Doc. No. 116, at 17.   Duncanson further argues that the Court may exercise specific jurisdiction over SJ Wathen Bloomington for her claims under sections 48.193(1)(a)(1) and (2).   *Id.* at 6–7, 12–13.

Plaintiffs argue that the Court may exercise general jurisdiction over SJ Wathen Bloomington because it "maintains an office in Florida—Ms. Wathen's home and the Jacksonville studio—where [Sarah] Wathe[n] performs all her day-to-day work."[11]   Doc. No. 116, at 17; *see generally* Doc. No. 36 ¶ 11 (alleging that Sarah Wathen resides in Jacksonville, Florida).   In support of their argument, Plaintiffs cite *Benedict v. Gen. Motors Corp.*, 142 F. Supp. 2d 1330 (N.D. Fla. 2001), in which the court assessed whether it could exercise general jurisdiction over a supplier of vehicle parts that was a Delaware corporation with its principal place of business in Michigan. The defendant asserted that it did not manufacture in or acquire from Florida any of the products that it sold, and that it made no sales in Florida.   *Id.* at 1331.   The court noted, however, that the

---

[11]   Insofar as Plaintiffs argue that SJ Wathen Bloomington maintains a Jacksonville studio, they have offered no evidentiary support.   On October 1, 2013, SJ Wathen Jax LLC became the sole member of WNC of Jacksonville, LLC.   Pls.' Hearing Ex. 33, at 5.   SJ Wathen Bloomington, however, has no relationship with WNC of Jacksonville, LLC.   *Id.* at 3.

defendant "maintain[ed] an office in Florida with a full-time employee." *Id.* at 1336.   It determined that such a fact

> would be sufficient to constitute 'substantial and not isolated activity within the state,' even without regard to the facts that [the defendant] has obtained a certificate of authority to do business in the state, has attended a trade show and tested products in the state, and continuously supplies parts to one or more manufacturers knowing that the parts will be incorporated into finished products that will be sold in the state in high, volume on a daily basis.

*Id.*

Despite Plaintiffs' contention, the *Benedict* decision pre-dated the Supreme Court's decision in *Daimler* and is largely obviated by it.   Indeed, in *Daimler*, the Court determined that a defendant having multiple facilities in California, including a regional office, was not sufficient grounds for the exercise of general jurisdiction.   *Daimler*, 134 S. Ct. at 752, 760–62.   Post-*Daimler*, therefore, the mere presence of an office in a state is an insufficient basis for general jurisdiction.   *See Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014) (determining that, after *Daimler*, the presence of branch offices in a forum provided "no basis consistent with due process for the district court to have exercised general jurisdiction").

The record here, though, does not simply indicate that SJ Wathen Bloomington had an office in Florida.   Instead, the record shows that Sarah Wathen effectively directs the operations of SJ Wathen Bloomington out of her home in Jacksonville.   *See* Wathen Depo. 20:14–16; *see also* Doc. No. 36 ¶ 11.   As the *Daimler* Court noted, a corporation's principal place of business is a paradigm basis for general jurisdiction.   *Daimler*, 134 S. Ct. at 760.   A principal place of business is best understood as an entity's "nerve center" — i.e., the location from which "officers direct, control, and coordinate" the entity's activities.   *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010).

Sarah Wathen books all the events for SJ Wathen Bloomington from Florida.   *Id.* at 21:9–15, 22:4–5.   In Jacksonville, she "do[es] things like scheduling, [and] answering phone calls and emails" on behalf of SJ Wathen Bloomington.   *Id.* at 20:9–10.   She posts events on the SJ Wathen

Bloomington calendar from home, *id.* at 26:6–12, and she and her husband choose the artwork to be placed on the calendar for public events, *id.* at 22:9–12.   She is an administrator of the SJ Wathen Bloomington Facebook page, and posts to that page from Florida.   *Id.* at 27:16–28:7.   She also submits her biannual business reports to Indiana from her home in Florida.   *Id.* at 41:10–42:5.

While the paint parties may occur in Indiana, Sarah Wathen coordinates and directs SJ Wathen Bloomington's activities out of her home in Florida.   Such activities are the same that the Supreme Court determined to be a paradigm basis for the exercise of general jurisdiction.   *Daimler*, 134 S. Ct. at 760.   As a result, SJ Wathen Bloomington may fairly be considered "at home" in Florida, and the exercise of general jurisdiction is consistent with both section 48.193(2) and the Due Process Clause.   *See Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1345 (S.D. Fla. 2009); *see also Richards v. Fin. Servs. Auth.*, No. 5:09-cv-447-Oc-32GRJ, 2010 U.S. Dist. LEXIS 65885, at *11 (M.D. Fla. May 27, 2010) (noting that the analyses under section 48.193(2) and the Due Process Clause collapse into a single inquiry), *adopted by* 2010 U.S. Dist. LEXIS 65911 (M.D. Fla. June 1, 2010).

Because I recommend that the Court find that SJ Wathen Bloomington is subject to the Court's general jurisdiction, I will not address Duncanson's alternative theories of specific jurisdiction.

## V.     RECOMMENDATIONS.

In light of the foregoing, I respectfully **RECOMMEND** that Defendants' motion to dismiss for lack of personal jurisdiction be **GRANTED in part and DENIED in part**.   I respectfully **RECOMMEND** that that Court **DISMISS**, for want of jurisdiction, the claims brought by Duncanson against W&C IP Holdings, W&C Development, Scott, and McCracken.   I further **RECOMMEND** that the Court **DISMISS** Wiseman's claims against W&C Development for lack of jurisdiction.   In all other respects set forth above, I **RECOMMEND** that the Court find that the exercise of personal jurisdiction is appropriate.

Recommendations concerning Defendants' non-jurisdictional arguments will be set forth in a subsequent Report and Recommendation.

Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar an aggrieved party from challenging on appeal the district court's order based on unobjected-to factual findings and legal conclusions.

Recommended in Orlando, Florida on June 24th, 2015.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy